# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Person of Jilai LUO | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:25MJ212 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the     Middle     District of     North Carolina     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1956/1957 | Money Laundering / Monetary Transactions in Criminally Derived Property |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Attached Affidavit of Special Agent George Jasek.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

On this day, the applicant appeared before me by reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

/s/ George Jasek
*Applicant's signature*

George Jasek, Special Agent, USSS
*Printed name and title*

Date: 5/28/2025

Judge's signature

City and state: Winston-Salem, North Carolina

United States Magistrate Judge Joi Elizabeth Peake
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PERSON OF JILAI LUO, 4311 PINE BARK TRAIL, DURHAM, NORTH CAROLINA 27705, AND A 2024 NISSAN ROGUE BEARING NORTH CAROLINA LICENSE PLATE WWR9839 | 1:25MJ 212 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Special Agent George Jasek, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent ("SA") with the United States Secret Service ("USSS") and have been so employed since March 2018. I am currently assigned to the Criminal Investigative Division in Washington, District of Columbia. In preparation for my employment with USSS, I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. Additionally, I completed the Special Agent Training Course ("SATC") at the USSS James J. Rowley Training Center in Laurel, Maryland. While attending SATC, I received a five-day

1

training titled "Basic Investigation of Computer and Electronic Crimes Program." In addition to these training programs, I have completed numerous in-service training courses related to constitutional law. Prior to my employment with USSS, I was a full-time certified Police Officer in New Hampshire for more than five years. My present duties include the investigation of federal offenses, including, but not limited to, those involving financial fraud and its related activities. As part of my duties, I have conducted numerous financial crime and financial fraud investigations. These investigations have included but are not limited to federal violations of wire fraud, bank fraud, money laundering, and identity theft statutes. During these investigations, I have conferred with other investigators who specialize in computer and cellular device forensics and who have conducted investigations regarding financial fraud crimes. I have received additional training regarding computers which includes Basic Network Intrusion Responder Training, Incident Response Analysis, and virtual currency training.

## PURPOSE OF THE AFFIDAVIT

2. This affidavit is made in support of an application for warrants to search:

    a. The person of Jiali LUO ("LUO"), as described more fully in Attachment A-1.

b.     4311 Pine Bark Trail, Durham, North Carolina 27705 ("Subject Residence"), believed to be the residence of Jiali LUO, as described more fully in Attachment A-2.

c.     a 2024 Nissan Rogue bearing North Carolina License Plate WWR9839, and Vehicle Identification Number (VIN) JN8BT3CA7RW353405 (the "Subject Vehicle"), believed to be a vehicle used by LUO, as described more fully in Attachment A-3.

3.     The requested search warrant seeks authorization to seize the items described more fully in Attachment B, which are the evidence, fruits, instrumentalities of violations of 18 United States Code Sections 1343 (Wire Fraud), 1956 (Money Laundering), 1957 (Monetary Transactions in Criminally Derived Property), or 371 (Conspiracy), (the "Subject Offenses"). Attachment A-1 through A-3, and Attachment B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in

3

substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## SUMMARY OF PROBABLE CAUSE

5.      USSS is investigating an international money-laundering syndicate that launders the proceeds of fraud schemes, including cryptocurrency investment scams and other currency-related frauds commonly referred to as "pig-butchering." Victims of the schemes under investigation were fraudulently induced into transferring millions of dollars to U.S. bank accounts opened in the names of dozens of shell companies whose sole apparent purpose was to facilitate the laundering of fraud proceeds. Many of these accounts and shell companies were located in the Central District of California. A network of money launderers then facilitated the transfer of those funds to other domestic and international bank accounts and cryptocurrency platforms in a manner designed to conceal the source, nature, ownership, and control of the funds.

6.      Specifically, USSS identified approximately 74 U.S. shell companies which opened bank accounts with U.S. financial institutions. These bank accounts received millions of dollars in wire fraud proceeds from U.S. victims of cryptocurrency investment scams. After receiving fraud proceeds, a network of U.S-based money launderers executed transactions transferring

the proceeds from the shell companies to two bank accounts in the Bahamas. The U.S. Attorney's Office in the Central District of California charged nine of these U.S.-based money launderers; seven of the defendants have pleaded guilty as of the date of this warrant.

7.     Financial analysis showed that seven of the approximately 74 shell companies collectively wired over $800,000 to a business account opened by LUO for which LUO was the sole signer. The USSS identified these seven shell companies as companies used by the money laundering conspiracy, described in paragraphs 23 through 26, to move victim fraud funds. LUO's business account also received $170,000 from a business account associated with Shengsheng He ("He").[1] He pleaded guilty to a conspiracy to operate an illegal money transmitting business as part of the above-described scheme. The opening documents for LUO's business bank account, which received nearly one million dollars from the seven shell companies and the He-affiliated business account, listed LUO's true date of birth, LUO's North Carolina driver's license number, and LUO's residence, the Subject Residence.

8.     Additionally, based on my training and experience, I know that individuals involved in the Subject Offenses often keep evidence of the Subject

---

[1] He is a defendant in <u>United States v. Shengsheng He</u>, 2:25-CR-175-RGK, discussed in paragraph 26 below.

5

Offenses on their person, in their vehicles, in their residences, and on their digital devices.

9.    Therefore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses described in Attachment B will be found on LUO's person, in the Subject Residence, and in the Subject Vehicle, as further described in Attachments A-1 through A-3.

## FACTS IN SUPPORT OF PROBABLE CAUSE

10.    Based on records, witness interviews, my review of electronic communications, and my knowledge of this investigation, I know the following:

### A.    Investigation into a Cryptocurrency Investment Scheme

11.    In September 2022, law enforcement began an investigation into a criminal money-laundering syndicate operating cryptocurrency investment scams, also known as "pig-butchering." The term "pig butchering" (derived from the Chinese phrase used to describe this scheme) is a type of scam that involves scammers developing relationships and building trust with their victims to gain their confidence. After developing a relationship and gaining trust, scammers instruct their victims to make significant capital investments in what victims believe are legitimate cryptocurrency trading platforms. In this syndicate, the scammers promoted spoofed domains and websites purporting to be legitimate cryptocurrency trading platforms to U.S. victims. Scammers then fooled victims into "investing" in cryptocurrency through these

6

fraudulent investment platforms, which instead allowed the scammers to steal their money.

12. Once victim funds were obtained, the syndicate used various money-laundering techniques to conceal the nature and source of the victim funds. These techniques included the use of money couriers, a high volume of financial transactions with no legitimate commercial purpose, and shell accounts.

13. Structurally, the money laundering syndicate included (1) individuals who received the victim funds directly into U.S. bank accounts they set up in the names of U.S. shell companies they established; (2) individuals who recruited, trained, and managed the team of U.S.-based money launderers; (3) intermediary companies that facilitated the conversion of the fraud proceeds into cryptocurrency, or received cryptocurrency fraud proceeds directly and transferred them on; and (4) individuals who managed the network, connecting the organizations running the scamming operation with the laundering network.

**B.  Example of Pig Butchering Fraud and the Subsequent Money Laundering Using Shell Companies**

14. On or about December 19, 2022, law enforcement interviewed Victim 1, who resided in Santa Ana, California, within the Central District of California. Victim 1 noted they were a victim of a cryptocurrency investment

scam. More specifically, Victim 1 sent approximately $84,460 via wire transfers from their Bank of America account intended to be investments in cryptocurrency through a website called "gammaex.net" ("GAMMAEX"). Victim 1 said that on or about August 24, 2022, they met an individual named "Daniel" on a Facebook dating app. Around that time, Victim 1 began chatting on WhatsApp and Telegram with Daniel. Victim 1 noted that they believed they were in a romantic relationship with Daniel. Further, Victim 1 provided law enforcement with their chat records with Daniel, and I can confirm the chats were romantic in nature.

15.    Victim 1 noted that Daniel soon began promoting cryptocurrency investments and told Victim 1 they could make a lot of money. According to Victim 1, they did not understand cryptocurrency and Daniel provided Victim 1 with a link to a cryptocurrency investment website (GAMMAEX) to start making investments. Victim 1 further stated that Daniel instructed Victim 1 to consult the online customer service portal to start making payments.

16.    On or about September 26, 2022, Victim 1 contacted GAMMAEX customer service through the online portal and was directed to send $25,000 via wire from their Bank of America account to a wire address provided by the GAMMAEX customer service platform. Victim 1 then began to see via the GAMMAEX platform that they had made significant profit, which encouraged Victim 1 to make additional investments. On or about October 12, 2022, Victim

8

1 wired another $31,000 from their Bank of America account to a JPMorgan Chase Bank ("JPMC") account ending 3886 ("JPMC account 3886"), in the name of Sea Dragon Trading, LLC, that was opened by Hailong Zhu ("Zhu"),[2] who was the sole signatory of JPMC account 3886. Further, law enforcement learned JPMC account 3886 was registered to an address in California that was known to be associated with Zhu.

17.    On or about October 24, 2022, Victim 1 then attempted to make a withdrawal from GAMMAEX; however, online customer service at GAMMAEX informed Victim 1 that their account was frozen and that they needed to pay $28,460 in taxes. Consequently, on or about October 24, 2022, Victim 1 wired $28,460 from their Bank of America account to another account provided by GAMMAEX. Victim 1 then attempted another withdrawal from GAMMAEX, and customer service informed Victim 1 that their account had been frozen due to suspicious activity and a security deposit of 30% was required to unfreeze their account. On or about November 12, 2022, when unable to withdraw any investment proceeds, Victim 1 concluded they were a victim of a scam and ceased making additional transfers.

---

[2] Zhu is a defendant in United States v. Lu Zhang, 2:23-CR-596-RGK, discussed in paragraph 24.

18.     Victim 1 has been unable to recover any of their funds. Victim 1 shared chat communications with law enforcement, which corroborate the false and fraudulent statements that induced Victim 1 to invest in the scheme.

19.     Victim 1's funds were then laundered through a U.S.-based shell company before being transferred to a bank account in the Bahamas, converted into cryptocurrency, and further disseminated to co-conspirators. Records obtained for JPMC account 3886 belonging to Sea Dragon Trading, LLC, reflect Victim 1's $31,000 deposit on October 12, 2022. JPMC records reveal that on October 17, 2022, $40,000 was wired from JPMC account 3886 to a bank account at Deltec Bank and Trust ("Deltec Bank") in the Bahamas.[3] Records obtained from Deltec Bank show that the $40,000 in fraud proceeds originating from JPMC account 3886 were deposited into a Deltec Bank account on October 17, 2022.

20.     Deltec Bank records also reveal that later, on October 17, 2022, the $40,000 in proceeds, including the $31,000 from Victim 1, were transferred to

---

[3] Funds first flowed to a Deltec Bank-owned account at Mitsubishi UFJ Trust and Banking Corporation ("MUFJ") in New York, New York, before transferring to Bahamas Accounts #1 and #2.

Delchain Limited[4] (hereinafter "Delchain") and used to purchase a cryptocurrency called Tether ("USDT").[5]

21. Sea Dragon Trading, LLC has been the subject of numerous other victim complaints. The company is registered to a residential address with a stated business purpose of "General TRADING." Based on my training and experience, and review of documents, the company was not involved in "General TRADING," but rather, was a shell company set up for the sole purpose of receiving fraud proceeds.

22. Victim 1's experience with the fraud is generally consistent with those of hundreds of other victims who have reported their losses to law enforcement. Additionally, the set-up and operation of Sea Dragon Trading, LLC is consistent with that of the other approximately 73 shell companies that law enforcement has identified as being connected to this scheme. As discussed in more detail below, LUO opened and controlled a business bank account that directly received funds from seven of those 74 identified shell companies that were identified using the above-described pattern of money laundering.

---

[4] Delchain Limited is a virtual currency entity associated with Deltec Bank.

[5] Tether, also known as USDT, is a type of virtual currency known as a stablecoin. USDT is pegged to the U.S. dollar. This means that the value of 1 USDT is generally equal to the value of $1.

## C. Investigation Into Money Laundering Network Leads to Multiple Federal Charges and Guilty Pleas

23.     Specifically, co-conspirators set up these approximately 74 U.S. shell companies and opened bank accounts with U.S. financial institutions, including Bank of America, JPMC, and Wells Fargo. These bank accounts received millions of dollars in wire fraud proceeds from U.S. victims of cryptocurrency investment scams. After the receipt of fraud proceeds into these U.S. bank accounts, a network of U.S.-based money launderers executed transactions transferring the proceeds primarily to two bank accounts established at Deltec Bank in the Bahamas. The first Deltec Bank account, "Bahamas Account #1," was an account at Deltec Bank opened in the name of the business entity Axis Digital Limited. The second Deltec Bank account, "Bahamas Account #2," was an account at Deltec Bank opened in the name of the business entity GTAL (Cambodia) Co., Ltd. Both Bahamas Account #1 and Bahamas Account #2 received millions in fraud proceeds from U.S. victims.[6]

24.     The United States Attorney's Office for the Central District of California has charged several individuals related to this scheme. First, in United States v. Lu Zhang, et al., 2:23-CR-596-RGK, a grand jury in the Central District of California voted to indict four individuals – Lu Zhang

---

[6] The fraud proceeds first flowed through a Deltec-affiliated bank account at MUFJ in New York, New York.

("Zhang"), Justin Walker ("Walker"), Joseph Wong ("Wong"), and Zhu – with conspiracy to commit money laundering and substantive money laundering. Defendants Zhang, Walker, and Wong pleaded guilty to conspiracy to commit money laundering. Zhu is a fugitive. Each defendant was involved in the U.S.-based money-laundering network and effectuated financial transactions sending fraud proceeds from U.S. shell company bank accounts to Bahamas Account #1.

25.     Second, in <u>United States v. Daren Li, et al.</u>, 2:24-CR-311-RGK, the government indicted two individuals – Daren Li ("Li") and Yicheng Zhang ("Zhang") – with conspiracy to commit money laundering and substantive international money laundering. Li and Zhang pleaded guilty to money laundering conspiracy. Li was involved in the direction of funds into and out of Bahamas Account #1 and Bahamas Account #2. Zhang was involved in the domestic money-laundering network.

26.     Additional co-conspirators in this money laundering conspiracy have been charged and pleaded guilty. In <u>United States v. Shengsheng He</u>, 2:25-cr-00175-RGK, and <u>United States v. Jose Somarriba</u>, 2:25-cr-00181-RGK, He and Jose Somarriba ("Somarriba") both pleaded guilty to conspiracy to operate an illegal money transmitting business. Both Somarriba and He were involved in establishing and facilitating the use of Bahamas Account #1 to move fraud proceeds. In <u>United States v. Jingliang "James" Su</u>, 2:25-cr-00362-

13

MRA, Jingliang Su ("Su") agreed to plead guilty to the same conspiracy to operate an illegal money transmitting business involving Bahamas Account #1.

### D. LUO Received Proceeds from Identified Shell Companies

27.     Law enforcement learned about two Wells Fargo Bank, N.A. ("Wells Fargo") accounts associated with LUO, opened in the name of GHK ENTERPRISES LLC, both of which list the Subject Residence in the account opening forms.

28.     According to records from Wells Fargo, LUO was the sole signer listed on a business bank account in the name of GHK ENTERPRISES LLC with an account number ending in 2849 (the "GHK Account"). Further, LUO's true date of birth, LUO's North Carolina driver's license number, and the Subject Residence address were all listed on the business bank account opening documents for the GHK Account. In the GHK Account opening documents, LUO's mobile phone number[7] is listed as the business phone number for GHK ENTERPRISES LLC. The account opening documents for the GHK Account list LUO's business relationship with GHK ENTERPRISES LLC as "Owner with Control of the Entity." According to the same account

_____

[7] According to subscriber records obtained from AT&T, the mobile phone number identified on the account opening documents for the GHK Account identify LUO as the owner of the number and the Subject Residence as his address.

opening documents, the GHK Account was opened on July 26, 2022, and list the "Industry" for GHK ENTERPRISES LLC as "Management of Companies and Enterprises" and a "Description of Business" as "Provides management services."

29.     According to Wells Fargo records, LUO is one of two authorized individuals who opened and maintained a Wells Fargo brokerage account in the name of GHK ENTERPRISES LLC with an account number ending in 3952 (the "GHK Brokerage Account"). The account opening documents for the GHK Brokerage Account show LUO's true date of birth and identify the Subject Residence as LUO's physical address.  The account opening documents for the GHK Brokerage Account list LUO as the "entity owner" of GHK ENTERPRISES LLC as well as an "individual with significant responsibility for maintaining" GHK ENTERPRISES LLC. The account opening documents for the GHK Brokerage Account show an Internal Revenue Service ("IRS") document assigning an Employer Identification Number ("EIN"). LUO is listed on this document as the "SOLE MBR" of GHK ENTERPRISES LLC and a listed address of the Subject Residence.[8]

---

[8] Based on my training and experience I believe "SOLE MBR" to mean "sole member."

30.     Based on my training and experience, when an address is used to open business bank accounts and is used in connection with IRS forms assigning an EIN, that address is likely used for business purposes.

31.     Additional public records corroborate LUO's connection to GHK Enterprises LLC. According to North Carolina Secretary of State records, GHK Enterprises LLC was formed on May 17, 2022. Annual reports in calendar years 2023, 2024, and 2025 filed for GHK Enterprises identify LUO as a "member" of GHK Enterprises LLC and that LUO certified each annual report. As of April 3, 2025, the North Carolina Secretary of State website identifies LUO as the only company official for GHK Enterprises LLC.

32.     USSS financial analysis of the GHK Account determined that the GHK account had a balance of $9,949.00 as of February 21, 2023. On February 23, 2023, the GHK Account received a wire in the amount of $233,000 from Lively HomeGood LLC, a shell company known to receive victim pig butchering fraud proceeds as part of the money laundering conspiracy involving the defendants charged and convicted in the criminal cases identified in paragraphs 24 through 26 above.

33.     USSS identified the following entities as shell companies involved in the fraud scheme described above: Gudi Trading Inc, YYJ Consulting Corporation, Good Luck Trading LLC, Sea Dragon Remodel Inc, SMX Beauty

Inc, LQH Supply LLC, and Lively HomeGood LLC. USSS determined each of these shell companies sent funds to the GHK Account.

34.     According to victim complaints, each of these shell companies received funds from victims of pig butchering fraud scams. I know through this investigation that each of the shell companies named in paragraph 33 were set up in the United States by money mules for the purpose of moving fraud proceeds out of the United States. I have reviewed victim complaints relating to many of these shell companies reporting that victims fell victim to pig butchering fraud scams and sent funds to these shell companies. There is no indication that any of these shell companies were in fact involved in the industries claimed on the registration forms. The companies acted as shell entities for the transfer of funds into and out of U.S. bank accounts.

35.     Between September 27, 2022, and February 17, 2023 the GHK Account received approximately $827,000 in incoming wires from the shell companies discussed in paragraph 33, which are outlined below in *Figure 1*.

Figure 1

| Date | Sending Shell Company | Amount |
|---|---|---|
| 9/27/2022 | GUDI TRADING INC | $100,000.00 |
| 9/29/2022 | YYJ CONSULTING CORPORATION | $120,000.00 |
| 10/11/2022 | GOOD LUCK TRADING LLC | $90,000.00 |
| 11/14/2022 | SEA DRAGON REMODEL INC | $125,000.00 |
| 12/16/2022 | SMX BEAUTY INC | $160,000.00 |
| 2/2/2023 | LQH SUPPLY LLC | $82,000.00 |
| 2/17/2023 | LIVELY HOMEGOOD LLC | $150,000.00 |

## E. Additional Banking Records Show LUO's Business Bank
## Accounts Received Funds From Pig Butchering Co-Conspirator

36.     USSS reviewed records from Bank of America on a business account named Crestview Services Inc. with an account number ending in 3257 (the "Crestview Account"). The account opening documents for the Crestview Account identify He[9] as Crestview Services' "Secretary." He is also listed as a "member" on a 2019 Annual Report for Crestview Services Inc., that was incorporated in Florida. Records from the Crestview Account show that on October 13, 2022, a $125,066.00 counter credit deposit was received and on October 31, 2022, a $10,000 online banking transfer from Checking account 8809 deposit was received. From my training and experience, I know that a counter credit is a cash or check deposit made in person at a bank. On October 31, 2022, Bank of America records for the Crestview Account show that a wire in the amount of $100,000 was sent to the GHK Account and was mostly funded by the $125,066.00 counter credit and $10,000 bank transfer discussed above.

37.     On December 11, 2022, Victim 2 filed an IC3[10] complaint stating that they fell victim to a pig butchering scheme and were scammed into sending what they believed were funds for investment. Victim 2 was instructed

---

[9] He is a defendant in <u>United States v. Shengsheng He</u>, 2:25-CR-175-RGK, discussed in paragraph 26 above.

[10] The Internet Crime Complaint Center (IC3) is an FBI clearinghouse for cybercrime complaints.

to send the funds to a JPMC account belonging to an entity called Haoyu 198 Trading (the "Haoyu 198 Trading Account"). JPMC records show Victim 2 sent $150,000 to the Haoyu 198 Trading Account on October 26, 2022, and another $176,440 to the same account on November 15, 2022.

38.    The following day on November 16, 2022, the JPMC account for Haoyu 198 Trading sent $150,000 to the Crestview Account. On November 18, 2022, Bank of America records for the Crestview Account show that a wire in the amount of $70,000 was sent to the GHK Account and was mostly funded by the $150,000 deposit from Haoyu 198 Trading Inc. Haoyu 198 Trading Inc has been identified by the USSS as a U.S.-based shell company laundering victim proceeds.

39.    On October 31, 2022, and November 18, 2022, the GHK Account received wire transfer deposits from the Crestview Account which are shown below in *Figure 2*.

*Figure 2*

| Date | Sending Account | Amount |
|------|-----------------|--------|
| 10/31/2022 | CRESTVIEW SERVICES INC | $100,000.00 |
| 11/18/2022 | CRESTVIEW SERVICES INC | $70,000.00 |

F. **The GHK Account Transfers to the GHK Brokerage Account**

40.    Between January 30, 2023, and February 21, 2023, the GHK Account transferred $984,831.00 to the GHK Brokerage Account across five

19

transactions. Details regarding these five transactions are outlined below in *Figure 3*.

*Figure 3*

| Date | Receiving Account | Amount |
|---|---|---|
| 1/30/2023 | GHK ENTERPRISES LLC BUSINESS BROKERAGE | 734,825.00 |
| 2/1/2023 | GHK ENTERPRISES LLC BUSINESS BROKERAGE | 3.00 |
| 2/9/2023 | GHK ENTERPRISES LLC BUSINESS BROKERAGE | 100,000.00 |
| 2/14/2023 | GHK ENTERPRISES LLC BUSINESS BROKERAGE | 3.00 |
| 2/21/2023 | GHK ENTERPRISES LLC BUSINESS BROKERAGE | 150,000.00 |

41.    These five transfers from the GHK Account to the GHK Brokerage Account were funded mostly by wires to the GHK Account from the USSS identified shell companies discussed above in paragraph 33 as shown in Figure 1, and the wire transfers from the Crestview Account to the GHK Account as shown in Figure 2. In total, approximately 98% of the total amount of transfers from the GHK Account to the GHK Brokerage Account were funded by the USSS identified shell companies and the Crestview Account. The total amount of transfers to the GHK account from the USSS identified shell companies and Crestview Services Inc. is $997,000.

42.    On March 3, 2023, the GHK Brokerage Account transferred $565,000 back to the GHK Account via an online transfer.

20

43.    On March 3, 2023, the GHK Account made a withdrawal in the amount of $781,764.12. USSS financial analysis showed that utilizing the Lowest Intermediate Balance Rule (LIBR) methodology, the withdrawal of $781,764.12 was primarily funded by the $565,000 transfer from the GHK Brokerage Account on March 3, 2023, and the $233,000 from Lively HomeGood LLC on February 23, 2023.

## G. Surveillance of LUO, Subject Vehicle, and Subject Residence

44.    On or about April 14, 2025, at approximately 1304 hours, USSS agents conducted an undercover surveillance operation in the area of 2024 West Main Street, Durham, North Carolina 27708. I observed the Subject Vehicle parked unoccupied at 2024 West Main Street, Durham, North Carolina 27708 on the east side of the building near section "C" of the building. A law enforcement query of the Subject Vehicle shows that the Subject Vehicle is registered to LUO with a listed address of the Subject Residence.

45.    Continuing on April 14, 2025, at approximately 1736 hours, I observed LUO exit the door of section "C" of the building located at 2024 West Main Street, Durham, North Carolina 27708. I had previously viewed the North Carolina driver's license photo of LUO via a law enforcement database and immediately recognized LUO to be the person I observed exiting the building. I observed LUO walk to the Subject Vehicle, put a bag in the back

seat driver's side of the Subject Vehicle, and get into the driver seat of the Subject Vehicle.

46. I observed LUO depart from 2024 West Main Street, Durham, North Carolina, 27708 in the Subject Vehicle on April 14, 2025, at approximately 1736 hours. USSS agents surveilled the Subject Vehicle which traveled to the Subject Residence. I observed the Subject Vehicle pull into the driveway of Subject Residence on April 14, 2025, at approximately 1750 hours. A USSS agent drove past the Subject Residence and observed LUO operating the Subject Vehicle which was backing into the garage of the Subject Residence. I then drove past the Subject Residence and observed the Subject Vehicle backed into the garage of the Subject Residence. I did not observe any other vehicles in the driveway or garage of the Subject Residence.

47. On April 14, 2025, at approximately 1754 hours, I observed LUO walk to the mailbox at the end of the driveway at the Subject Residence.

### G. TRAINING AND EXPERIENCE REGARDING MONEY LAUNDERING

48. Based on my training and experience and information obtained from other law enforcement officers who investigate money laundering crimes, I know the following:

   a. Individuals who engage in the Subject Offenses often keep significant physical evidence, fruits, and instrumentalities of their crimes

inside their residences, including, but not limited to, ledgers reflecting funds laundered, financial transaction reports, identification documents and records confirming residency, communications with and documents identifying co-conspirators and victims of fraud, access devices relating to financial accounts (such credit and debit cards), detailed financial records, and cash proceeds.

b.    Such evidence, fruits, and instrumentalities are also often stored in locked containers, safes, secret compartments, closets, drawers, above or below ceiling and floor tiles, behind false walls, and in other places intended to avoid detection by other people, including law enforcement.

c.    Commission of the Subject Offenses in the manner set forth above necessarily requires the use of computers, smart phones, tablets, or other computer devices and storage media for the individual to access bank accounts and/or cryptocurrency exchanges and wallets, connect with co-conspirators, and engage in transfers of money and/or digital currency. I have learned through training and experience that individuals who engage in the Subject Offenses also commonly use electronic devices to keep track of co-conspirators, keep records of illegal transactions and criminal proceeds, and store copies of online chats, emails, and other data. It is also common practice for individuals involved the Subject Offenses to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions. Suspects often use digital devices to

perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.

d. In addition, I know that individuals involved in crimes involving cryptocurrency may keep on electronic devices cryptocurrency client and wallet files, digital signature software and related authentication keys, as well as encryption software and related encryption keys. I know that individuals often keep such electronic devices inside their residences or in their vehicles. In the case of smart phones, tablets, and laptop computers, perpetrators may also keep such devices on their person, either in their pockets or in containers such as carrying bags, cases, backpacks, or protective sleeves.

e. Based on my training and experience, I further know that individuals who participate in the Subject Offenses often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

49. Because the Subject Offenses involve financial crimes and the use of cryptocurrency, the items to be seized could be stored almost anywhere within the Subject Residence (any parking spaces, storage spaces, or other outbuildings), Subject Vehicle, or on LUO's person, in both physical and

24

electronic formats. For example, Attachment B seeks cryptocurrency addresses, private keys, recovery seeds, PGP keys, and passwords. These pieces of data comprise long and complex character strings, and, in my training and experience, I know that many cryptocurrency users write down or otherwise record and store such items because they are too long to commit to memory. As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence.

50.     For all of the foregoing reasons, there is probable cause to believe that records, data, and documents regarding the Subject Offenses will be found within the Subject Residence, within the Subject Vehicle, and/or on the person of LUO, including in computers or on other devices that store electronic data and that investigators reasonably believe to be used by LUO.

51.     Based on my training and experience, I also know that any individual, to include co-conspirators, with access to a cryptocurrency wallet's recovery key or private keys has the ability to transfer the corresponding cryptocurrency held in that wallet. This can be done very quickly. This warrant therefore respectfully requests authority to transfer any identified virtual currency to a law enforcement-controlled cryptocurrency wallet.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[11]

52.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and

---

[11] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

      53.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not

<div align="center">27</div>

always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

54. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.

28

To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **LUO**'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## SPECIFICS OF SEARCH AND SEIZURE OF DIGITAL DEVICES

55.    This application seeks permission to search for records that might be found on LUO's person, in the Subject Residence, and in the Subject Vehicle,

as further described in Attachments A-1 through A-3, in whatever form they are found. One form in which the records are likely to be found is electronic data stored on a digital device. Thus, the warrant applied for would authorize the seizure of digital devices and the copying of electronically stored information, all under Rule 41(e)(2)(B).

56.     I submit that if a digital devices is found on LUO's person, in the Subject Residence, and in the Subject Vehicle, as further described in Attachments A-1 through A-3, there is probable cause to believe that evidence of violations of the Subject Offenses will be found in the information contained on the device.

57.     I also know that during the search of a premises it is not always possible to search digital devices for data for a number of reasons, including the following:

    a.     Searching digital devices is a technical process that requires specific expertise and specialized equipment. If the device is locked and the password is unknown, the process is further complicated and may require specialized techniques.

    b.     The volume of data stored on mobile devices will typically be so large that it will be highly impractical to search for data during the execution of a physical search; and

c.    digital devices users can attempt to conceal data within unassuming or locked application. A substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

58.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing digital devices that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the data contained therein.

## CONCLUSION

59.    Based on the foregoing, the undersigned submits that there is probable cause to believe that the items listed in Attachments B, which constitute evidence, fruits, and instrumentalities of the Subject Offenses may be located on LUO's person, at his Subject Residence, and in the Subject Vehicle. I therefore seek a warrant to search the places and person described in Attachments A-1 through A-3 and any digital devices which agents reasonably believe to be used by LUO, and to seize the items described in Attachment B.

<div style="margin-left: 40%;">

Respectfully submitted,
/s/ George Jasek
George Jasek
Special Agent
United States Secret Service

</div>

Dated: May 28, 2025

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

32

## ATTACHMENT A-1

<u>PERSON TO BE SEARCHED</u>

The person to be searched is Jiali LUO ("LUO") (date of birth March 5, 1963), an Asian male that is 5'8" in height, with brown eyes, and black hair. The following photograph depicts LUO:



The search shall include a search of any and all clothing, personal items, or containers (e.g., purses, briefcases, and bags) on the person of or in the possession of LUO at the time of execution.

## ATTACHMENT A-2

<u>PREMISES TO BE SEARCHED</u>

The residential property located at 4311 Pine Bark Trail, Durham, North Carolina 27705 ("Subject Residence"). The Subject Residence is a multiple-story residence that has a light colored brick front with white colored siding, black colored shutters, and a black colored roof. The Subject Residence has an attached two car garage. There is a black mailbox at the bottom of the driveway to the Subject Residence that has the numbers "4311" clearly affixed to the top of the mailbox. The following photograph depicts the Subject Residence:



The property to be searched includes: (a) all rooms, balconies, containers, and safes in the Subject Residence; (b) any parking spaces, storage spaces, or other outbuildings associated with the Subject Residence

VEHICLE TO BE SEARCHED

A 2024 Nissan Rogue bearing North Carolina License Plate WWR9839, and Vehicle Identification Number (VIN) JN8BT3CA7RW353405 (the "Subject Vehicle"). The following photograph depicts the Subject Vehicle:



35

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

1.      The items to be seized are the fruits, instrumentalities, and evidence of violations or property designated or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. 1343 (Wire Fraud), 1956 (Money Laundering), 1957 (Monetary Transactions in Criminally Derived Property), or 371 (Conspiracy to Commit the Same), (the "Subject Offenses") namely:

        a.      Any documents and records of transactions to include bank statements, deposit and withdrawal slips, bank receipts, signature cards, debit/credit cards, receipts of ATM withdrawals or purchases made with debit/credit cards, receipts for cashier's checks, wire transfer documents, ledgers, journals, and any documents containing the personal identifying information ("PII") of victims, suspects, or aliases used by those involved in the conspiracy.

        b.      U.S. currency, receipts from money services bureaus, money orders, cashier's checks, prepaid gift cards, and any other cash equivalent capable of being used in the laundering/conversion of the proceeds of the crime.

        c.      Virtual currency and related records of any kind, to include: any and all representations of virtual currency public keys or addresses, whether in electronic or physical format; any and all representations of virtual

36

currency private keys, whether in electronic or physical format; any and all representations of virtual currency wallets or their constitutive parts, whether in electronic or physical format, to include recovery keys which may be used to regenerate a wallet;[12]

        d.     Any indicia of occupancy, residency, or ownership of the Subject Residence or Subject Vehicle, and things described in the warrant, including, but not limited to: forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing.

        e.     Any digital device believed to be used or accessed by LUO which is itself or which contains evidence, contraband, fruits, or

---

[12] In order to effectuate this seizure, the United States is authorized to load any wallet files, their constitutive parts, or private keys, onto the Government's own servers. The United States is further authorized to transfer any identified virtual currency to a virtual currency address controlled by the United States and retain such virtual currency for no longer than 60 days absent further extensions by a court with jurisdiction over the property. The United States is also authorized to maintain a copy of the virtual currency wallet file(s) loaded onto the Government's servers for no longer than 60 days absent further extensions by a court with jurisdiction over the property. The restored wallet file(s) will continue to collect any virtual currency transferred into the seized virtual currency wallets as a result of transactions that were pending at the time of the seizure. The United States is authorized to transfer any virtual currency received by the restored wallet(s) into a virtual currency address controlled by the United States.

instrumentalities of the Subject Offenses, and forensic copies thereof, including but not limited to text messages, photographs, email content, and the content of encrypted messaging applications.

        f.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, including but not limited to logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs either through text or in end-to-end encrypted applications, photographs, and correspondence.

        ii.    Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

        iii.    Evidence of the attachment of other devices.

        iv.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device.

        v.    Evidence of the times the device was used.

vi.    Passwords, encryption keys, and other access devices that may be necessary to access the device.

vii.    Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of it.

viii.    Records of or information about Internet Protocol addresses used by the device.

ix.    Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras;

39

gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## I.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.  During the execution of this search warrant, law enforcement is permitted to: (1) depress LUO's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of LUO's face with his or her eyes open to activate the facial-, iris-, or

retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them. Further, this warrant does not authorize law enforcement personnel to request that any individuals state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including unique finger(s) or other physical features) that may be used to unlock or access the devices.

6.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.